CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
NOV 1 6 2012
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| SUSAN K. PETERS, | ) | CASE NO. 5:11CV00133 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | By: B. Waugh Crigler |
| | ) | U. S. Magistrate Judge |

This challenge to a final decision of the Commissioner which denied plaintiff's April 29, 2009 protectively-filed application for a period of disability and disability insurance benefits under the Social Security Act ("Act"), as amended, 42 U.S.C. §§ 416 and 423 is before this court under authority of 28 U.S.C. § 636(b)(1)(B) to render to the presiding District Judge a report setting forth appropriate findings, conclusions, and recommendations for the disposition of the case. The questions presented are whether the Commissioner's final decision is supported by substantial evidence, or whether there is good cause to remand for further proceedings. 42 U.S.C. § 405(g). For the reasons that follow, the undersigned will RECOMMEND that an Order enter GRANTING the Commissioner's motion for summary judgment, AFFIRMING the Commissioner's final decision, and DISMISSING this action from the docket of the court.

In a decision dated March 22, 2011, an Administrative Law Judge ("Law Judge") found that plaintiff had not engaged in substantial gainful activity since January 31, 2008, her alleged date of disability onset.[1] (R. 18.) The Law Judge determined plaintiff's back disorder and

---

[1] Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of

1

fibromyalgia syndrome were severe impairments. (R. 18-19.) He found that plaintiff's sleep apnea, cervical torticollis, hyperlipidemia, hypothyroidism, gynecological disorder, and mental condition were non-severe impairments. (R. 18-19.) He also concluded that, through the date of the hearing, plaintiff did not suffer an impairment or combination of impairments which met or equaled a listed impairment. (R. 19-20.) Further, the Law Judge found that plaintiff possessed the residual functional capacity ("RFC") to perform a range of light work, with the limitations that she could only occasionally perform postural activities involving climbing, balancing, stooping, kneeling, crouching, and crawling.[2] (R. 20-28.)

The Law Judge further relied on portions of the testimony of Robert W. Jackson, a vocational expert ("VE"), which was in response to questions premised on the Law Judge's RFC finding. (R. 28-30, 76-85.) Based on this testimony, the Law Judge determined that plaintiff was not capable of performing any of her past relevant work. (R. 28.) However, he found that there were other jobs existing in significant numbers in the national economy which plaintiff could perform, including work as a food preparation worker, cashier, counter clerk, and mail clerk.[3] (R. 29-30.)

---

impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). In order to qualify for a period of disability and disability insurance benefits, plaintiff must establish that she became disabled prior to the expiration of her insured status, which is December 31, 2013. *See* 20 C.F.R. § 404.131(a); (R. 18, 88, 197.)

[2] Light work is defined in 20 C.F.R. § 404.1567(b) and 20 C.F.R. § 416.967(b) as involving lifting no more than 20 pounds occasionally and 10 pounds frequently, standing or walking 6 hours in an 8-hour workday, and sitting about 6 hours in an 8-hour workday.

[3] Alternatively, the Law Judge found that if plaintiff had the RFC to perform light work with the limitations that she could only lift a maximum of ten pounds, stand or walk for a maximum of four hours, and perform only occasional postural activities, she could still work as a parking lot attendant and cashier. (R. 30.) Additionally, the Law Judge found that if plaintiff had the RFC to perform sedentary work with a sit/stand option and occasional postural limitations, she could still find work as a telephone order clerk, general production worker, material handler, and cashier. (R. 30.)

Plaintiff appealed the Law Judge's March 22, 2011 decision to the Appeals Council. (R. 1-6, 12.) In its October 3, 2011 decision, the Appeals Council found no basis to review the Law Judge's decision, denied review, and adopted the Law Judge's decision as the final decision of the Commissioner. (R. 1-2.) This action ensued, cross motions for summary judgment were filed together with supporting briefs, and oral argument was held by telephone before the undersigned on October 18, 2012.

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984). The regulations grant some latitude to the Commissioner in resolving conflicts or inconsistencies in the evidence, which the court is to review for clear error or lack of substantial evidentiary support. *Craig v. Chater*, 76 F.3d 585, 589-590 (4th Cir. 1996). In all, if the Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the court is to affirm the Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is defined as evidence, "which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than preponderance." (*Id.* at 642.) When the Appeals Council considers additional evidence offered for the first time on administrative appeal and denies review, courts must consider the record as a whole, including the new evidence, in determining whether the Law Judge's decision is supported by substantial evidence. *Meyers v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011); *Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir. 1991).

Plaintiff challenges the final decision on two grounds. First, plaintiff argues that the Law Judge failed to properly consider the severity of her back disorder and fibromyalgia. (Dkt. No.

3

14, at 2-4.) Second, she argues that the Law Judge erred by finding that plaintiff's sleep apnea and gynecological disorder were not severe impairments. (*Id.* at 4-5.) The undersigned will consider these arguments below.

The Law Judge found that while her back impairment and fibromyalgia were severe, the treatment record did not support her allegations regarding the severity of her limitations or the intensity of her expression of subjective symptoms. (R. 27.) He pointed out that plaintiff's treatment generally has been conservative, without back surgery or ongoing pain management treatment. (R. 27.) He pointed out that even plaintiff's treatment providers had noted their medical findings did not support all of her claimed symptoms. (R. 27.) The Law Judge also found that the testing and imaging evidence did not show an impairment which reasonably could produce the extent or intensity of plaintiff's alleged pain and limitations. (R. 27.) Additionally, he found that plaintiff had stopped performing her past relevant work for business rather than because of her impairments, she had furnished inconsistent information about her functional abilities, and that there was no treating source evidence indicating that plaintiff was disabled or severely limited. (R. 27-28.) Accordingly, he found that plaintiff was capable of performing light work with limitations. (R. 20, 30.)

There is no question that plaintiff suffers pain and physical limitations from her back disorder and from fibromyalgia. However, there are inconsistencies in the record concerning the severity, persistence, and intensity of her symptoms. A June 2008 x-ray of plaintiff's back revealed that she had mild levo-convex scoliosis and sacralization of the L5 vertebrate. (R. 303.) However, it revealed no other abnormalities and was described as a "negative examination." (R. 303.) A treatment note from October 2008 disclosed that plaintiff suffered "chronic lower

4

back/fibromyalgia/possible post trauma pain," but the physician, Thomas Patterson, M.D., indicated that the pain had improved with medication. (R. 352-353.)

On March 6, 2009, Dr. Patterson found that plaintiff's back pain was associated with right leg pain and foot drop, with tenderness and reduced sensation in her back and a "minimally positive, if at all," straight leg test. (R. 274.) Plaintiff's pain was described as 4 out of 5, and she was prescribed new medication and scheduled for an MRI. (R. 274, 351.) Presuming sacralization of the L5 vertebrate, the MRI revealed that plaintiff had a posterior annular tear and small central disc herniation at L4-5. (R. 272.) Plaintiff's neurologist, Peter Puzio, D.O., reported on March 26, 2009 that plaintiff was not responding to conservative measures and indicated that demonstrated slight weakness in her foot and walked with a slight limp. (R. 271.) He also believed that plaintiff would respond to an epidural steroid for what he described as nerve irritation from a "small disk (sic)." (R. 271, 553.)

Plaintiff was scheduled for epidural steroid injections in April 2009, but they were not successful in controlling her back pain, which remained 4 out of 5; however, a May 2009 straight leg test was negative. (R. 326-329, 346.) Another examination in May 2009 also revealed that plaintiff ambulated normally and without difficulty, had normal muscle strength and normal range of motion with no pain in her back, had no tenderness, and had otherwise normal straight leg and other orthopedic test results. (R. 561-562.) Plaintiff was diagnosed with chronic lower back pain, unresponsive to conservative care and was informed that surgery would have a 50% chance of reducing her pain. (R. 562.) Plaintiff's doctors continued to describe her back pain in October 2009 as severe and not well controlled. (R. 497-498.) In December 2009, however, plaintiff's pain was reported at 2 out of 5 in December 2009, and she was prescribed methadone to bring it under further control at some cost savings to her. (R. 494-495.)

5

Her medications appear to have relieved her back pain, and in March 2010, Dr. Puzio reported that plaintiff's pain was controlled with methadone and Dilaudid. (R. 491-493, 516-517.) X-Rays performed in May 2010 revealed that plaintiff had rotator scoliosis, with no acute or progressive abnormalities since June 2008. (R. 501.) In May 2010, Matthew Hogenmiller, M.D., noted an absence of any findings supportive of a "distinct condition other than fibromyalgia..." (R. 499-500.) While noting that her back and overall pain had worsened, Dr. Hogenmiller suggested she be prescribed anti-depressants to improve emotional condition. (R. 499-500.) Also in May 2010, Dr. Patterson noted that plaintiff was "on methadone with Dilaudid breakthrough which is at least working fairly well," had a negative straight leg test, and there was a lack of physical findings to explain some of her symptoms. (R. 489.) In July 2010, Dr. Puzio reported that plaintiff's examination was "without clear focality" and that "at this point in time, she does not have a clear diagnosis to explain all of her current symptomatology." (R. 568-569.) An MRI performed on her cervical spine in July 2010 also showed a mild diffuse disc bulge, but it revealed no other abnormalities. (R. 577-578.)

During an examination in August 2010, plaintiff expressed disappointment that she was being taken off methadone, stating that it helped her pain, though possibly causing her side effects. (R. 583.) Dr. Patterson noted that plaintiff's neck and back pain were chronic, and that he was still searching for a better means of pain control. (R. 583.) He also found her back to be minimally tender on range of motion and stated that plaintiff was having difficulties but was working on getting her life back in order. (*Id.*) Additionally, plaintiff has presented with normal gait and normal motor strength and without the need of assistive devices in various physical examinations. (R. 437, 451-453, 455, 458-460, 516-517, 561-562, 568-569, 611, 614, 617-621.)

6

Plaintiff began treatment for fibromyalgia in May 2008. (R. 299, 436-437.) She complained of pain all over and was diagnosed as suffering fairly mild tender points throughout her neck, back, and extremities. (R. 437.) Physical therapy was recommended. (R. 437.) There is evidence from May 2008 that plaintiff's pain was rated as 5 out of 5. (R. 460.) By June and August of 2008, however, plaintiff's pain had been reduced to 1 and 0 out of 5 respectively (R. 458-459.), with Dr. Hogenmiller opining that her symptoms were well controlled. (R. 456.) In October 2008, Dr. Patterson found that plaintiffs pain, possibly from fibromyalgia, had improved, and he expressed hope that she would continue to do better. (R. 352.)

Plaintiff continued to receive treatment every few months from Dr. Hogenmiller from May 2008 through November 2010. Her reports of pain varied greatly over this period, from 0 out of 5 to 5 out of 5, though averaging about in the middle of the scale. (R. 451-460, 611-621.) In October 2009, plaintiff's fibromyalgia was noted as "not well treated with any of the preventative medicines," and it was suggested that plaintiff be placed on methadone. (R. 497.) In March 2010, plaintiff's chronic pain was noted as controlled by methadone and Dilaudid. (R. 516-517.) She later informed her doctors that methadone helped her pain. (R. 583.) However, in May 2010, Dr. Hogenmiller found that plaintiff's pain was worsening and indicated that plaintiff had not responded well to previous medications. (R. 499.) He suggested that plaintiff be prescribed anti-depressants to treat her symptoms. (R. 499-500.) In July 20, 2010, Dr. Puzio acknowledged a possible diagnosis of fibromyalgia by Dr. Hogenmiller, but he concluded that no clear diagnosis explained all her then current symptomatology. (R. 569.)

It is clear that plaintiff has suffered, but the ultimate questions concern intensity, persistence, and its vocational effects. The Law Judge expressed doubts regarding the causes and severity of plaintiff's pain, and the doubts appear shared even by some of plaintiff's treating

7

physicians. (R. 499-500, 569.) As the Law Judge found, and plaintiff's treating sources noted, there is no objective evidence of an impairment that could reasonably produce all of plaintiff's multiple subjective symptoms. (R. 27, 489, 499, 569.) Though plaintiff had tender points throughout her neck, back, elbows, and knees, they were "fairly mild," and Drs. Patterson and Puzio referred to fibromyalgia as a possible explanation for plaintiff's pain. (R. 352, 437, 568.) In addition, the alleged intensity of plaintiff's pain varied greatly over the course of treatment, and, in any event, it appears to have been controlled for extended periods, especially while she was on methadone. (R. 352, 456, 516-517, 583.) Moreover, plaintiff displayed few physical limitations as a result of her pain and generally was found normal on physical examinations. (R. 437, 451-453, 455, 458-460, 516-517, 561-562, 568-569, 611, 614, 617-621.) While one treatment source opined that she suffered a reduced range of motion in her spine, hip, and shoulder, as well as reduced flexion in her fingers, no treating source suggested that she was incapable of performing substantial gainful activity. (R. 450.) Additionally, the Law Judge properly relied on inconsistencies in plaintiff's descriptions of her daily activities, specifically her ability to shop, in finding that her claims may not be entirely reliable.[4] (R. 27-28, 212, 222.) Accordingly, while the undersigned may have given more weight to plaintiff's allegations of disabling pain, there is substantial evidence supporting the Law Judge's finding that though plaintiff has pain; it does not render her disabled.

The Law Judge found that neither plaintiff's sleep apnea nor her gynecological disorder were severe impairments. (R. 18-19.) He acknowledged that plaintiff had received treatment for these impairments; however, he further found that she had failed to allege any limitations

---

[4] *See* SSR 96-7p, 1996 WL 374186 (July 2, 1996) (the Commissioner may consider all relevant evidence of record in making a credibility determination). *See also Craig v. Chater*, 76 F.3d 585, 592-596 (4th Cir. 1996); 20 C.F.R. § 404.1529(a)-(c) (2011).

8

stemming from them, and that the record did not indicate that they had a more than minimal effect on plaintiff's functional capabilities. (R. 18-19.)

An impairment is considered non-severe if it is a slight abnormality, or combination of abnormalities, that has no more than a minimal effect on a claimant's ability to perform basic work activities. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984). Here, plaintiff originally was diagnosed with sleep apnea on October 21, 2009, at which time it was thought to be mild. (R. 528-529.) A November 2009 sleep study revealed that plaintiff suffered from moderately severe obstructive sleep apnea for which CPAP therapy was recommended. (R. 526-527.) Plaintiff claimed she lost her medical insurance when her insurance carrier found out about her sleep apnea. (R. 494.) In a January 2010 sleep study, plaintiff's CPAP machine was calibrated and found to adequately treat her obstructions, though, as in the initial study, no REM sleep was recorded. (R. 538-539.) A February 2010 treatment note indicated that the CPAP machine was helping, and in May and August 2010, plaintiff's sleep apnea was reported at stable. (R. 489, 492, 583.) Additionally, a sleep-deprived EEG in November 2011 also revealed normal findings during both awake and brief sleep states. (R. 576.) Plaintiff even testified at the hearing before the Law Judge that she was doing very well with her CPAP machine. (R. 55.) She stated, "I sleep good (sic). And I'm still tired, but sleeping well. I sleep probably about six hours a night." (R. 55.) Plaintiff has neither received nor sought additional treatment for her sleep apnea, and she has not complained of problems sleeping since being placed on CPAP. Because the record before the court indicates that plaintiff's sleep apnea has been well treated by her CPAP machine, and in light of the fact that plaintiff has not pointed to any limitations beyond those taken into account by the Law Judge in his RFC finding, there is substantial

evidence supporting the Law Judge's finding that plaintiff's obstructive sleep apnea is a non-severe impairment.

The Law Judge's finding that plaintiff's gynecological disorder is non-severe is also supported by substantial evidence. Plaintiff appears to have had a history of vaginal dysplasia dating back to March 2007, though a colposcopy was negative at the time. (R. 513.) In February 2010, a pap smear revealed a high grade sqaumous intraepithelial lesion causing moderate to severe dysplasia. (R. 519.) This diagnosis was confirmed on March 10, 2010 and a biopsy was submitted. (R. 518.) Colposcopy and a biopsy did not reveal findings as severe as the Pap smear, but they did reveal mild to moderate dysplasia on the vaginal cuff as well as a small area of the vulva and a pre-cancerous skin lesion on the vulva. (R. 511-514.) Plaintiff was scheduled for laser ablation of all abnormal areas, which was performed on April 12, 2010. (R. 511-514.) On April 27, 2010, an examination revealed that plaintiff had "no difficulty at all" since the procedure and was healing well. (R. 510.) A June 2010 treatment report noted that plaintiff had no complaints regarding her impairment and treatment, though she did report that she suffered diminished libido and sexual desire, vaginal dryness, and failure to achieve orgasm. (R. 595.) A pap smear taken on that date revealed a low grade squamous intraepithelial lesion encompassing HPV, mild dysplasia, and Cervical Intraepithelial Neoplasia, a cancer precursor. (R. 594, 596.) In August 2010, plaintiff was scheduled for colposcopy and was found to be menopausal. (R. 594.) In October 2010, plaintiff again had no complaints and noted improvement in vaginal dryness. (R. 593.) Mark P. Brooks, M.D., noted that plaintiff's colposcopy did not reveal any obvious dysplastic lesion and, otherwise, was negative. (R. 593.) Plaintiff was scheduled to follow up in six months time. (R. 593.)

Plaintiff testified during the hearing before the Law Judge that her gynecological condition was mild and noncancerous, though she indicated that she would need to keep an eye on it for the rest of her life. (R. 56-57.) Plaintiff made no complaints to her treating physicians, and she did not indicate in her testimony before the Law Judge that she was limited in any way as a result of her gynecological disorder. (R. 56-57.) With this record of successful treatment, and no vocational limitations, the undersigned concludes that the Law Judge's finding that plaintiff's gynecological disorder is a non-severe impairment is supported by substantial evidence.

For all these reasons, it is RECOMMENDED that an Order enter GRANTING the Commissioner's motion for summary judgment, DENYING plaintiff's motion for summary judgment and motion to remand, and DISMISSING this case from the docket of the court.

The Clerk is directed to immediately transmit the record in this case to the presiding United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to transmit a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: /s/ _____
U.S. Magistrate Judge
11-16-2012
Date